CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
June 30, 2025
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
      DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **MARCUS INGRAM,** | ) | Case No. 7:23-cv-00801 |
| Plaintiff, | ) | |
| v. | ) | Hon. Robert S. Ballou |
| | ) | United States District Judge |
| **SGT. D. SQUIER, et al.,** | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Marcus Ingram, a Virginia inmate proceeding by counsel[1], filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants violated his constitutional rights by imposing excessive visual strip searches at Keen Mountain Correctional Center, where he is incarcerated. Defendants Sgt. D. Squier, a correctional officer at the facility, and Warden I. Hamilton, the Warden of the facility, moved for summary judgment, to which Ingram has responded. Dkt. 38, 40. Because Ingram has not shown that defendants violated his constitutional rights, the defendants' motion for summary judgment will be granted.[2]

### I. Factual Background[3]

In 2023, for a period lasting approximately 30-60 days, Keen Mountain increased

---

[1] Though Ingram was initially pro se when he filed his complaint on December 11, 2023, counsel filed a Notice of Appearance in May 2024. Dkt. 21.

[2] The plaintiff here, along with two other inmate plaintiffs, moved to consolidate their cases for purposes of discovery, which the court granted on August 26, 2024. The plaintiffs were all housed at Keen Mountain, subjected to the same strip search procedure, are represented by the same counsel, and have filed similar pleadings. *See* Case Nos. 7:23cv584, 7:23cv740, and 7:23cv801.

[3] The following facts are undisputed or construed in the light most favorable to the nonmoving party, unless otherwise noted.

the frequency of strip searches for inmates participating in no contact video visits, requiring strip searches both before and after video visits.[4] Pursuant to this policy, Ingram endured 26 strip searches between June 26, 2023 and July 25, 2023, related to video visitations with his wife. Sec. Am. Compl. ¶ 19. These strip searches occurred in a relatively private area, were conducted by members of the same sex, and were visual only, involving no touching.[5] Dkt. 39 ¶¶ 14-16; Dkt. 40 ¶¶ 14-16.

Warden Hamilton imposed the strip search policy based on prison officials' belief that inmates were using the video visitation room to pass drugs and other contraband. Aff. Squier, Dkt. 39-2, ¶ 4, Dkt. 39-3 at 23, Dkt. 39-7. Keen Mountain inmates of security level 4 and security level 1-2 use the video visitation room, one of the only places at the prison used by both security levels. Dkt. 39 ¶ 7. While Ingram disputes that evidence exists that inmates used the video visit area to exchange contraband, he acknowledges Warden Hamilton's statements at deposition that the "intel" from confidential informants indicated the inmates were leaving the drugs in the video visitation room, to exchange it through the entire prison population. Dkt. 39 ¶ 8, Dkt. 40 ¶ 8; Dkt. 39-3 at 14.

In the months preceding the strip search policy, correctional officers found contraband on inmates on multiple occasions, including drugs rolled up in toilet paper, in the waistband of a prisoner's pants, and in a black glove inside an inmate's rectum, as well as in inmate's cells. Aff. Squier, Dkt. 39-2, ¶ 4. During this same timeframe, multiple separate inmate overdoses occurred, requiring administration of Naloxone (Narcan) by prison staff. *Id.* As Ingram points out, these

---

[4] Warden Hamilton made the decision to conduct these additional strip searches, which the VDOC Western Regional Operations Chief approved. Dkt. 39 at 3.

[5] Sgt. Squier, who performed most of the strip searches at issue on Ingram, generally indicated that he instructed Ingram to spread his fingers, open his mouth and stick out his tongue, run his fingers through his hair, lift his arms, lift his penis, lift his testicles, and squat and cough. Dkt. 40 ¶ 27.

were "incidents around the facility," not involving inmates using video visitation or the video visitation room. Dkt. 40 ¶ 4.

Ingram brings Counts I and II, alleging violations under the Fourth and Eighth Amendments by both defendants, and Count III for supervisory liability against Warden Hamilton. Ingram maintains that the number of strip searches was excessive, and thus not reasonable under the circumstances. Indeed, Ingram acknowledges that some searches would have been reasonable under defendants' explanation that inmates were using the video visit room to exchange contraband but argues that the "sheer number and frequency" of the searches Ingram endured was not reasonable. Dkt. 40 at 9. In support, Ingram points to the fact that searches occurred both before and after all no contact video visits, even though it is undisputed that inmates could not have physical contact with anyone while in the video visitation room. Dkt. 40 ¶ 22. Ingram also emphasizes that no contraband was found on Ingram during the strip searches, nor on any of the other inmates using video visitation. *Id.* ¶¶ 28, 29.

Defendants ask for summary judgment, arguing the searches were reasonable under the Fourth Amendment and that Ingram cannot establish the required elements for an Eighth Amendment claim.

## II.    Summary Judgment Standard

The court should grant summary judgment only when the pleadings and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. On summary judgment, the court must view the facts and the

reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Id.* at 255. However, when a motion for summary judgment is properly supported by affidavits, the nonmoving party may not rest on the mere allegations or denials in his pleadings. *Anderson*, 477 U.S. at 256. Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find in his favor. *Id.* at 256-57.

### III.     Law and Analysis

#### A.  Fourth Amendment Claim

"A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984) (finding "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell"). However, while prisoners must surrender many rights of privacy, compared to those people claim in their private homes, the Fourth Circuit recognizes limited Fourth Amendment rights of bodily privacy. *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) (discussing a strip search of a female inmate done in the presence of male guards, noting that most people have a "special sense of privacy in their genitals [such that] involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating").

In the prison context, a search is reasonable under the Fourth Amendment if the need for the search outweighs the invasion of personal rights that the search entails. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (describing a detention facility as a "unique place fraught with serious security dangers" and upholding prison policy providing for a visual body cavity strip search of prison inmates). To determine the reasonableness of a sexually invasive search, the Supreme

4

Court in *Bell* held that four factors must be considered in each case: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. *Id.* Weighing these factors, I find the searches here reasonable under the Fourth Amendment.

Regarding the first two factors, both sides agree that the strip searches at issue were visual strip searches only, with no touching, conducted by male guards (i.e. guards the same sex as Ingram). Regarding the third factor, defendants justify the searches as a response to a growing drug problem in the prison, with multiple recent overdoses, applying intel that inmates were using the video visitation room to exchange contraband. Defendants provided incident reports showing over 15 inmate drug overdoses from February to June 2023, with 13 overdoses occurring in late May and June. Dkt. 39-5. While Ingram admits that this justification is "plausibly reasonable," he claims it does not explain the "sheer number and frequency of searches" including searching inmates both before and after the video visitation. However, I find that defendants' justification for initiating the visual strip searches, specifically as a response to increased drug overdoses, many of which required administering Narcan and other emergency medical care to unresponsive inmates, weigh in favor of reasonableness. Controlling contraband is a legitimate purpose, and necessary for the health and security of the inmates. *King v. Rubenstein*, 825 F.3d 206, 216 (4th Cir. 2016). Increased strip searches were a reasonable response to the recent spike in drug overdoses, which threatened the security of inmates and prison staff. Prison administrators are "obligat[ed] to take reasonable measures to guarantee the safety of the inmates" and "must be ever alert to attempts to introduce drugs and other contraband into the premises which . . . is one of the most perplexing problems of prisons today. . . ." *Hudson*, 468 U.S. at 526–27.

Ingram argues that it was excessive to search inmates, including Ingram, both before and after the video visit when the inmate has no contact with anyone in the video visit room, and thus, ostensibly, could not acquire contraband there. Defendant Sgt. Squier justified the searches by highlighting the various "creative" ways used by inmates to pass contraband. Depos. Squier, Dkt. 39-4 at 62. He described seeing inmates "take and get stuff under doors a lot easier than you think you could" as well as hiding items inside their bodies, which may not be found during a visual strip search. *Id.* at 62-66. Defendant Warden Hamilton also explained that he had acted on information that inmates were leaving the contraband in the video visitation room to spread it around the jail, thus justifying a search both before and after going into the room. Noting how small the drugs can be, Warden Hamilton explained that "inmates can hide things in different places, on their body, in their body, wherever" and thus, one inmate could leave it in the room, and then another would retrieve it and take it back to his building. Dkt. 39-3, at 23. He also described in detail how inmates can hide things – that it may be in their rectum, or underneath their arm or belly, or in their shoe – and that he took these measures to try to keep inmates safe and to keep them from overdosing. In Warden Hamilton's view, the strip search measures made sense, because "yes, [the inmates] absolutely sometimes can beat a strip-search, but sometimes they can't." *Id.* at 25; *See Johnson v. Robinette*, 105 F.4th 99, 115 (4th Cir. 2024).

The Warden's rationale is clear, one inmate may transport the drugs into the video room and leave them without being detected, but another inmate might transport those drugs out of the room and be caught.[6] *Id.* Importantly, though Ingram clearly disagrees with this rationale and resents its effect on him, he provides nothing showing it to be irrational, unnecessary, or contrary

---

[6] Warden Hamilton also indicated that inmates are strip searched before and after contact visitation, before or after leaving the prison, kitchen workers are strip searched going into and coming out of the kitchen, and those in restorative housing are strip searched every time they leave their cells. Dkt. 39-3, at 37-39, 46.

6

to the goal of prison security. That the video visitation room contained only a stool and a small screen, both bolted down, a locked door, and observation glass, does not change this analysis. Clearly, these are safeguards to promote security, but not foolproof in preventing inmates from hiding contraband. Courts have repeatedly deferred to prison administrators in the "adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547; *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322-23 (2012) ("In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security.").

Further, the fact that correctional officers found no drugs on Ingram during these searches does not necessarily make them unjustified. The United States Supreme Court, in *Bell*, rejected the argument that failing to find contraband made a search unreasonable, instead noting that the searches themselves may be having a deterrent effect. 441 U.S. at 559 ("That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises."). Finally, Ingram, while acknowledging that some searches were justified, argues that there must be a need for "**a particular search,** not searches in general." Dkt. 40 at 9 (emphasis in original). However, as this is Ingram's lawsuit, he would bear the burden of alleging a "particular search" was unjustified, which he has not even attempted to do. Further, "the Supreme Court has not required individualized suspicion for strip searches

involving inmates." *Amisi v. Brooks*, 93 F.4th 659, 667 (4th Cir. 2024) (*citing Bell*, 441 at 560 (1979)).

Regarding the final factor, these searches were conducted in a relatively private room, with only the correctional officers involved in the search present, and no member of the opposite sex present. Accordingly, I find that these searches were reasonable under the factors outlined in *Bell* and did not violate Ingram's limited Fourth Amendment rights to bodily privacy in the prison context.

### B. Eighth Amendment

The Eighth Amendment guarantees inmates the right to be free from "cruel and unusual punishments." U.S. Const. amend. VIII. To support his claim under the Eighth Amendment, Ingram alleges that the searches "served no penological purpose but were instead sexually invasive forms of intimidation and harassment." Dkt. 40 at 14. Inarguably, sexual assault of a prisoner by a correctional officer serves no penological purpose. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."). However, while accurate that sexual assaults of prisoners violate the Eighth Amendment, Ingram has provided no evidence of sexual assault in this case. This case involves visual strip searches only, with no touching, improper or otherwise, and I have already found that these searches served a reasonable purpose in the prison – to address the increased contraband that threatened the safety of both inmates and prison staff. The case law cited by Ingram is inapposite to the circumstances of this case. Visual strip searches are not sexual abuse – but instead have been upheld for precisely the penological purpose used here – to stem the flow of contraband in prison. *Johnson v. Robinette*, 105 F.4th 99, 117 (4th Cir. 2024) (visual strip searches performed in the course of official duties do not fall within PREA's

8

definition of sexual abuse); *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322 (2012) ("Weapons, drugs, and alcohol all disrupt the safe operation of a jail."); *see also West v. Murphy*, 771 F.3d 209, 212 (4th Cir. 2014) ("[C]ontraband poses significant security risks and dangers inside detention facilities. Weapons or other items may be used to attack officers or other arrestees. Arrestees may overdose on drugs, or their intoxication may create additional burdens for officers."). In *Johnson*, the Fourth Circuit wrote it had "no doubt that strip searches are a necessary tool for corrections officers who are responsible for seeking out such hidden contraband." 105 F.4th at 114. The Fourth Circuit rejected the inmates claim that a "reasonable jury" could find the correctional officer's strip searches were "sexually harassing and abusive" because the officer did not have a legitimate basis for the search – the same argument Ingram makes here. Ingram alleges no facts to support any claim for sexual assault, abuse, or rape, and does not allege any touching during the visual strip searches. Accordingly, Ingram does not have a claim under the Eighth Amendment.

  Because I find that the underlying conduct did not violate Ingram's constitutional rights, his claims for supervisory liability also are without merit. *See Temkin v. Frederick Cnty. Comm'rs,* 945 F.2d 716, 724 (4th Cir. 1991); *Doe v. Rosa*, 664 F. App'x 301, 304 (4th Cir. 2016) ("There can be no supervisory liability when there is no underlying violation of the Constitution.").

## IV. Conclusion

Accordingly, the defendants' motion for summary judgment will be granted.[7]

An appropriate order accompanies this opinion.

Entered: June 30, 2025

*Robert S. Ballou*

Robert S. Ballou
United States District Judge

---

[7] Defendants also argue that they are entitled to qualified immunity, however, as I find that Ingram has no constitutional claims, I need not address defendants' arguments concerning qualified immunity.